## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOSE A. RODRIGUEZ,

        Plaintiff,

        v.

CHILDREN'S HOME & AID
SOCIETY OF ILLINOIS,

        Defendant.

Case No. 16-cv-05225

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Jose A. Rodriguez worked for Defendant Children's Home & Aid Society of Illinois until his termination in October 2014. [1]. Plaintiff alleges that he was subjected to a hostile work environment and unlawfully terminated because of his age, asserting claims for age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*. *Id.* Defendant moved for summary judgment. [18]. For the reasons explained below, Defendant's motion is granted in part and denied in part.

## I.    Background

### A.    Local Rule 56.1 and Evidentiary Rules

The following facts come from Defendant's Local Rule 56.1 statement of material facts, [18-1], and Plaintiff's Local Rule 56.1 statement of additional facts,

[28].[1]  The parties disagree about a number of the circumstances of this case and Plaintiff filed an extensive response to Defendant's statement of facts.  [27].

Some of Plaintiff's bare-boned denials fail to show that the challenged facts are disputed, because Defendant's cited evidence supports those facts and a general denial in response to the opposing party's statement of fact does not sufficiently "rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial."  *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).  And "purely argumentative denials," legal conclusions, and unsupported denials do not belong in Local Rule 56.1 statements.  *Id.*; *see also Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (applying Rule 56 under its previous designation as Rule 12).  Finally, if material cited to support a denial "does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation."  *Malec*, 191 F.R.D. at 584.  If a party fails to adequately respond to an opponent's Rule 56.1(a) statement, a court may deem the opponent's factual allegations admitted.  *Id.*

Accordingly, this Court disregards Plaintiff's responses to paragraphs 27, 31, 35, 37, 40, 43, 48, 49, 53, 54, and 56 of Defendant's statement of fact.  *See* R. DSOF. Plaintiff either failed to cite specific record evidence to justify these denials or cited to irrelevant facts without providing an explanation.  This Court deems Defendant's corresponding statements of fact admitted.

---

[1] The facts discussed here are taken from the parties' Local Rule 56.1 statements. "DSOF" refers to Defendant's statement of undisputed facts, [18-1], and "PSAF" refers to Plaintiff's statement of additional material facts, [28].  "R. DSOF" refers to Plaintiff's responses to Defendant's statement of facts, [27].  References to additional filings are by docket entry number.

## B. The Encuentro/Bridges Programs

This case arises from Defendant's termination of Plaintiff in October 2014. [18-2] at 2. Defendant claims that it removed Plaintiff from his position as a case manager and counselor because he repeatedly failed to complete paperwork within the deadlines imposed by Defendant and Medicaid, from which Defendant receives funding. *Id*. Plaintiff asserts that Defendant fired him because of his age. [1] at 2.

Defendant, a nonprofit child and family service agency for the State of Illinois, offers various assistance programs for children and their families. R. DSOF ¶¶ 2, 10, 12. At the time of Plaintiff's employment, Defendant ran two related programs known as "Encuentro/Bridges," which offered "community-based counseling" for children and families on Chicago's West Side. DSOF ¶ 10. The programs provided "mental health services primarily to school age children." *Id*.

The Encuentro/Bridges programs were largely funded by two sources: Medicaid and grants. *Id*. ¶¶ 12–13. Defendant billed Medicaid for the services its employees provided to children and families. *Id*. Before Defendant could bill Medicaid, Medicaid required Defendant to provide documentation of the specific services that the Encuentro/Bridges programs provided, including mental health assessments of clients and individualized treatment plans. [18-12] at 3; DSOF ¶ 13. If any of these records were missing or not completed within a certain timeframe, Defendant could not bill Medicaid for services. DSOF ¶¶ 13–14; [18-12] at 3. The record remains unclear as to exactly when Medicaid needed those documents, but

the parties agree that Encuentro/Bridges staff members were responsible for completing and submitting them on time. *See* R. DSOF ¶¶ 14, 16.

### C.  This Case

Defendant hired Plaintiff as a counselor in August 1989. PSAF ¶ 1. Plaintiff holds a bachelor's degree in psychology and worked as both a counselor and case manager for Encuentro/Bridges. DSOF ¶ 1. On October 21, 2014, Defendant fired Plaintiff. DSOF ¶ 55. Plaintiff was 63 years old at the time. *See* DSOF ¶¶ 1, 55.

Plaintiff's allegations focus on Defendant's conduct from around June 2014, when Meg Garey became his supervisor, *see* DSOF ¶ 11; [18-12] at 2, to the time of his firing. In or around June 2014, Defendant employed Plaintiff and four other full-time staff members in the Encuentro/Bridges programs. R. DSOF ¶ 19. Plaintiff's co-workers included: Dora Quezada, a counselor/case manager with a bachelor's degree in social work who was 51 years old at the time; Luz Chaidez, a case manager with a bachelor's degree in social work who was 41 years old; Lorena Aguilar, a therapist with a masters' degree in social work who was 31; and Graciela Luque, a therapist with a masters' degree in social work who was 34. DSOF ¶¶ 20– 23. Plaintiff and Luque worked in both the Encuentro and Bridges program, [18-10] at 6, 16, 36, while the other staff members worked in the related Encuentro program, [28-5] at 8; [18-10] at 26; [28-3] at 6, 9.

At this time, Courtney Clark, Director of Child and Family Counseling Services, oversaw the Encuentro/Bridges programs. DSOF ¶ 11. Her duties included supervising managers and supervisors, meeting with the supervisors, and

overseeing the staff, funding, and budgeting. [18-7] at 6. The supervisors worked directly with staff members on their day-to-day activities. *Id.* Although the record indicates that Encuentro/Bridges were two different programs, *see* R. DSOF ¶ 44, they shared a supervisor, [27] at 4, 11; [18-7] at 7. Marlene Abiodun held that position until June 2014, when Meg Garey assumed this role. *See* DSOF ¶ 11; [18-12] at 2.

In 2013 and 2014, the Encuentro/Bridges programs received fewer grants, making the programs more reliant on Medicaid payments for their funding. DSOF ¶ 15. Timely submitting documents to Medicaid thus became even more important to the programs' financing. *Id.* Consequently, Clark placed pressure on the supervisors to ensure that staff members complied with the relevant deadlines. *See* DSOF ¶¶ 29–30. When Garey became the programs' supervisor in June 2014, Clark told her that the Encuentro/Bridges staff struggled to complete documentation in a timely and complete manner. *Id.* ¶ 29; [18-12] at 2, 4. Clark told Garey that it was her responsibility to bring the staff's paperwork into compliance. *See* [18-12] at 4.

Defendant provided all the Encuentro/Bridges staff with a written outline of deadlines for completing Medicaid billing documents. DSOF ¶ 17; [18-7] at 10, 38; [18-8]. Defendant and Plaintiff dispute the source of these deadlines. *See* R. DSOF ¶ 17. Defendant claims the deadlines derived from Medicaid's requirements, while Plaintiff argues that Garey set these deadlines when she became supervisor. *Id.* Nevertheless, the parties agree that Plaintiff knew of Defendants' deadlines and knew that all Encuentro/Bridges staff members had to meet them. *Id.* The parties

also agree that by June 2014, the entire Encuentro/Bridges staff, including Plaintiff, were neither meeting the deadlines nor reaching billable hour expectations. *Id*. ¶ 16.

In June 2014—Garey's first month as supervisor—she worked to ensure "that all staff members were aware of and understood program and Medicaid requirements." [18-12] at 4. In the third week of June 2014, all staff members had to cancel client appointments and remain in the office to complete overdue documentation. *Id*.; DSOF ¶ 30. At the end of the week, all staff except for Plaintiff and Quezada were current with their paperwork. R. DSOF ¶ 30. That same week, Garey reviewed each staff member's case files to create a tracking system for their documentation deadlines. [18-12] at 4. Her review revealed varying compliance with documentation requirements among the staff. *See id*; DSOF ¶¶ 31–38.

To address disciplinary issues such as paperwork noncompliance, Defendant used a formal "corrective action" program. DSOF ¶ 24. This program began with a verbal warning, followed by a written warning. *Id*.; [18-7] at 11. If the employee's work did not improve, the program called for the employee to be placed on probation; continued problems could lead to termination. *Id*. The Director's approval was required for all steps of the corrective action plan. DSOF ¶ 26.

### D.  Plaintiff's Performance

Plaintiff does not dispute that he struggled to comply with documentation requirements for some time. *See, e.g.*, R. DSOF ¶ 44. Defendant first took disciplinary action about Plaintiff's untimely paperwork in 2001. DSOF ¶ 44; [18-

10] at 19. In January 2001, Plaintiff got an oral warning for being "significantly late submitting" his documents for Medicaid billing; he was then two months behind on his paperwork. [18-10] at 19. Plaintiff was given 30 days to bring his records up to standard and was given additional time and flexibility at work to complete them. *Id*. at 19, 20. But by March 2001, Plaintiff still had not brought his paperwork up to date, so his then-supervisor Abiodun issued a written warning. *Id*. at 20.

Plaintiff's lack of timeliness created an ongoing problem. For example, in October 2011, Plaintiff's performance appraisal stated that his "challenge remains timeliness of his documents." [18-10] at 11. Overall, however, the appraisal concluded that Plaintiff met Defendant's expectations. *Id*. at 15. In March 2012, Defendant put Plaintiff on a corrective action plan because of problems with his Medicaid paperwork, including delays and incomplete files. *See* [18-7] at 41. At the time, Plaintiff worked his full-time hours in four days per week instead of five. *Id*. at 42. In a memorandum shared with Abiodun and Anne Barclay, the Vice President of Clinical and Community Services, Clark outlined the plan for Plaintiff and informed him that if he did not comply, he would have to work five days a week. *Id*. In October 2012, Plaintiff's performance evaluation indicated that Plaintiff still struggled to meet deadlines, although his overall rating remained "Meets Expectations." [18-10] at 16–17.

In March 2013, Defendant required Plaintiff to report to work five days a week instead of four because of his continuing trouble meeting deadlines. DSOF ¶ 47; [18-7] at 13–14, 43. Plaintiff's April 2014 performance evaluation stated that

Plaintiff needed to be "timelier with his paper work weekly," and that his timeliness continued to "fluctuate." [18-10] at 6. The same review, however, stated that Plaintiff met Defendant's expectations. *Id.* at 7. In June 2014, Defendant conducted a random review of one of Plaintiff's client files; the review revealed that the file lacked a current mental health assessment and an individual treatment plan for that client. DSOF ¶ 49.

When Garey reviewed Plaintiff's client files in June 2014, she saw clearly that Plaintiff's paperwork did not comply with the requirements of either the Encuentro/Bridges programs or Medicaid. *Id.* ¶¶ 48–49. For example, three of Plaintiff's case files were at least a year out of compliance and missing documents, while the remaining four files were four to nine months out of compliance. *Id.*

In July 2014, Garey placed Plaintiff on a corrective action plan. *Id.* ¶ 50; [18-12] at 55. From this point until he was fired in October 2014, Plaintiff worked under multiple corrective action plans. DSOF ¶¶ 50–55. During this period, Garey emailed Plaintiff deadlines to complete missing or incomplete documents as required by the plans; she also suspended his client contact and temporarily reassigned his files to other staff. *Id.* Defendant claims that it also gave Plaintiff "additional time to complete his noncompliant documentation." *Id.* ¶ 51. Plaintiff states that he was given the additional time to accommodate certain health complications. R. DSOF ¶ 51. Regardless, the corrective action plan and deadline extensions did not resolve Plaintiff's paperwork issues. DSOF ¶¶ 52–55.

At his annual performance review in September 2014, Plaintiff was notified of his continued failure to meet documentation expectations. DSOF ¶ 52. On September 15, Garey emailed Plaintiff a reminder about his outstanding documents. *Id.* ¶ 53; [18-12] at 39. On September 24, due to the "severity of his paperwork noncompliance," Plaintiff was placed on a Performance Improvement Plan (PIP). DSOF ¶ 53. The PIP's goal was to "address performance deficits relating to the completion and submission of required documentation." [18-7] at 47. The PIP "detailed the requirements" for Plaintiff to bring his documents into compliance, which was a "fundamental requirement of his position," and noted that his "failure to maintain significant and sustained improvement" could result in termination. DSOF ¶ 53; [18-7] at 8. Garey, Clark, Barclay, and Defendant's human resources department were all informed of Plaintiff's ongoing paperwork deficiencies. [18-7] at 21.

Plaintiff failed to comply with the PIP. On October 13, Garey emailed Plaintiff about his failure to submit service documentation on a weekly basis as the PIP required. DSOF ¶ 54; [18-12] at 42. On October 20, Garey emailed Plaintiff that two of his files were still missing notes on client sessions. DSOF ¶ 54; [18-12] at 43.

Plaintiff submits, in a dated and signed declaration, that he missed paperwork deadlines because the "Bridges Program required more hours of case management than Encuentro Program [sic]," and it therefore took him more time to complete his paperwork than some of the other staff who only worked for the

Encuentro program. [28-8] at 4. Plaintiff contends that this was because the Bridges program required more hours working directly with clients, or leaving the office to secure resources for clients, who in some cases faced more demanding challenges—such as gang-related activity—than clients in the Encuentro program. *See* R. DSOF ¶ 45; PSAF ¶ 34; [28-1] at 6.

### E. Timeliness of Plaintiff's Coworkers

The parties do not dispute that Plaintiff's coworkers sometimes struggled to meet documentation requirements; the parties disagree, however, about the extent to which his coworkers struggled to remain compliant. *See* R. DSOF ¶¶ 32–42.

A performance evaluation from December 2012 noted that Dora Quezada, another counselor/case manager, struggled to comply with the program's paperwork requirements. [18-10] at 24. The evaluation stated, however, that Quezada met expectations overall. *Id.* at 25. Similarly, in February 2014, Quezada's evaluation stated that she continued to "fluctuate with the timeliness of her paperwork." *Id.* at 22. Again, however, this evaluation rated her as meeting expectations. *Id.* at 23. When Garey reviewed Quezada's file in June 2014, she determined that Quezada was behind on her paperwork. DSOF ¶¶ 30, 32. In her affidavit, Garey acknowledges that Quezada's paperwork was noncompliant, but "not to the same extent" as Plaintiff's. [18-12] at 5; [27] at 9. Plaintiff asserts in his affidavit that Quezada was "very behind" on her paperwork, despite being in an "easier program" (Encuentro rather than Bridges). [28-8] at 5; R. DSOF 32.

Regardless, in June 2014, Quezada and Garey established a schedule for Quezada to complete her documentation requirements with ten weeks. DSOF ¶ 32. In his affidavit, Plaintiff alleges that Garey gave Quezada "the opportunity to spend more daily time in the office." [28-8] at 5. Ultimately, Quezada was placed on a PIP corrective action plan in February 2015, several months after Plaintiff embarked on a similar plan. DSOF ¶ 32. In her affidavit, Garey states that Quezada made steady progress towards compliance after being put on the PIP. *Id.*; [28-12] at 5.

Plaintiff tries to refute Garey's statement by pointing to a letter that Defendant sent the EEOC in November 2015. *See* R. DSOF ¶ 33. In the letter, Defendant, defending itself against a discrimination claim by Quezada, wrote that "she demonstrated ongoing issues with time management, including properly and timely completing required documentation." [28-5] at 3–4. The letter stated that almost every one of her performance reviews "mentions that she needs to improve the timeliness of her documentations and/or bill more hours," but "despite this repeated counseling, Quezada never demonstrated significant improvement." *Id.* at 4. The same EEOC letter, however, corroborates Garey's statement that Quezada showed "substantial improvement" on the PIP despite failing to fully meet the plan's requirements. [28-5] at 5.

The parties also dispute the quality of Luz Chaidez's work performance. *See* R. DSOF ¶ 34. Defendant claims that although Chaidez, a case manager, was not always perfectly compliant with program requirements, throughout her tenure with Defendant her timeliness improved. DSOF ¶ 34; [18-10] at 31. Plaintiff claims that

11

Chaidez told Plaintiff about her difficulty keeping up with program paperwork. [28-5] at 3; PSAF ¶ 17. At one point Defendant also placed Chaidez on a PIP. [28-3] at 10, 11. After Chaidez was laid off, in or around June 2015, she also filed an EEOC claim. *Id.* at 11, 12. Defendant's letter in response stated that although Chaidez did not meet its expectations after starting on a PIP, she did "show improvement." [28-6] at 4. According to the letter, Chaidez's PIP was extended as a result of this improvement; her performance subsequently improved to the point that she met Defendant's performance expectations. [28-6] at 4. Plaintiff does not offer any evidence to dispute this account of events after January 2015. *See generally* PSAF.

Graciela Luque, a therapist, also had occasional paperwork compliance issues. In Luque's December 2012 evaluation, Defendant indicated that she sometimes struggled to meet paperwork deadlines. [18-10] at 36. The same evaluation also stated that she met expectations. *Id.* at 37. Luque's October 2013 review stated that Luque worked "hard at being timely with documentation." *Id.* at 39. When Garey gave her employees in-office time in June 2014 to bring their paperwork up to date, Luque did so. [18-12] at 4, 5. Luque became noncompliant again later that year, however, and Defendant placed her on a PIP in December 2014. DSOF ¶ 38; [18-12] at 53. In her deposition, Luque states that Plaintiff and Quezada had more issues related to paperwork than she did. [18-11] at 7. To contest this assertion, Plaintiff argues that his coworkers got more time to work on their paperwork in the office. [28-8] at 7. Luque resigned voluntarily from her position at the end of 2014. [18-11] at 25.

Lorena Aguilar, another of the programs' therapists, was periodically out of compliance with program requirements, but never went on a PIP. DSOF ¶¶ 35, 36; *see also* [18-12] at 6. Aguilar was apparently current with her paperwork from June 2014 until she resigned in August 2014. DSOF ¶ 36.

Ultimately, due to ongoing funding challenges, the Encuentro/Bridges programs shut down in June 2015; Defendant terminated Quezada and the other remaining employees upon their closure. *See* [28-5] at 5.

Broadly, Defendant alleges that even though other Encuentro/Bridges staff members were behind on their paperwork in June 2014, Plaintiff's co-workers worked more diligently toward becoming compliant and required less micromanaging than Plaintiff did. DSOF ¶ 45. Plaintiff asserts that all the Encuentro/Bridges staff members demonstrated comparable paperwork problems. PSAF ¶¶ 15–39. Plaintiff claims that despite the common problem, he was the only one placed on a PIP in September 2014, while Garey waited months to place the other employees on similar plans. [28-8] at 7. Plaintiff also notes that he was the only employee to be terminated before the program closed in 2015. [29] at 11–12.

Finally, Plaintiff alleges that Garey treated him disrespectfully through intimidating "body language," yelling at him when he did not complete his work quickly, and making unspecified threats. [28-3] at 15, 16; [28] ¶ 5. Plaintiff claims that Garey told him that "his job was very stressful and due to his age, he should find a job that was more appropriate for his age." PSAF ¶ 34. Plaintiff alleges that Garey was only disrespectful to him and not to the other staff members. [28-3] at

15. Plaintiff also states that Garey made age-related comments on "at least three" occasions. [28-3] at 18. Garey made all of these alleged comments between August 2014 and Plaintiff's termination at the end of October 2014. *Id.*; DSOF ¶ 55.

The ultimate decision to terminate Plaintiff was collectively made by Garey, Clark, Vice President Barclay, and human resources. *Id.* ¶ 56. Plaintiff was 63 years old when Defendant fired him. *See* DSOF ¶¶ 1, 55. Plaintiff filed charges with the EEOC alleging age discrimination in April 2015; the EEOC sent Plaintiff a Notice of Right to Sue in February 2016. [1-2]. Plaintiff timely filed this action within ninety days of receiving the notice, and now brings claims for age discrimination under the ADEA. [1].

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the

evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, the "mere existence of a scintilla of evidence" supporting the non-movant's position is "insufficient; there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. Analysis

Plaintiff alleges that Defendant discriminated against him on the basis of age in violation of the ADEA. [1] at 1. Plaintiff originally brought a second claim for race and national origin discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, *id.* at 3, but voluntarily withdrew that claim, [29] at 1. Plaintiff's complaint does not identify which ADEA provisions he relies upon, but this Court understands Plaintiff to assert claims for wrongful termination in violation of 29 U.S.C. § 623(a)(1), and for a hostile work environment. The Seventh Circuit has assumed, without deciding, that hostile environment claims are cognizable under the ADEA. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001). Defendant seeks summary judgment on both claims. [18-2] at 1–2. This Court addresses each in turn.

### A. Wrongful Termination

Plaintiff alleges that Defendant wrongfully terminated his employment in violation of the ADEA. *See* [1] at 1–2; 29 U.S.C. § 623(a)(1). The ADEA protects

individuals 40 years of age or older from employment discrimination, including termination based upon age. 29 U.S.C. § 623(a); *Formella v. Brennan*, 817 F.3d 503, 514 (7th Cir. 2016). A terminated employee may prevail on an age discrimination claim if he can show that "his termination would not have occurred 'but for' his employer's age-based discriminatory motive." *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999).

When district courts in the Seventh Circuit analyze ADEA claims on summary judgment, they ask "whether the evidence would permit a reasonable factfinder to conclude" that the plaintiff's age "caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). District courts consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* This holistic analysis, set forth in the Seventh Circuit's *Ortiz* opinion, supplements the burden-shifting framework for discrimination claims that the Supreme Court created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

*McDonnell Douglas* requires a plaintiff to state a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) at the time of termination, he was performing reasonably on the job in accordance with the defendant's legitimate expectations; (3) despite his reasonable performance, he was subjected to an adverse employment action; and (4) similarly situated employees

outside of his protected class received more favorable treatment from the defendant. *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765. Once a plaintiff establishes a prima facie case, the burden shifts to the employer to offer "a legitimate, non-discriminatory reason for the employee's termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). If the employer does so, the employer merits summary judgment "unless the plaintiff presents evidence that the proffered reasons are pretexts for discrimination." *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995).

Because the *McDonnell Douglas* framework survives *Ortiz* and the parties present arguments in those terms, *see, e.g.*, [18-2] at 4, this Court will first assess Plaintiff's claim under *McDonnell Douglas*, s*ee Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 837 (N.D. Ill. 2017). This Court will then proceed under *Ortiz* to "assess cumulatively all the evidence presented to determine whether it permits a reasonable factfinder to determine" that Plaintiff's termination was attributable to his age. *David*, 846 F.3d at 224.

### 1. *McDonnell Douglas*

Defendant seeks summary judgment under *McDonnell Douglas* on the grounds that Plaintiff has not established a prima facie case of discrimination, thus failing the first step in that analysis. [18-2] at 4.

The parties agree that Plaintiff belonged to a protected class. *See* [18-2] at 5. The ADEA protects employees who are age 40 or older, 29 U.S.C. § 631(a), and Plaintiff was 63 years old when he was terminated, *see* DSOF ¶¶ 1, 55. The parties

also agree that Plaintiff suffered an adverse employment action: under the ADEA, adverse actions include termination. *See Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011). Plaintiff has therefore established the first and third prongs of his prima facie employment discrimination case. *See Andrews*, 743 F.3d at 234. Defendant contends that Plaintiff has not satisfied the second and fourth prongs of *McDonnell Douglas* by failing to show, respectively, that Plaintiff met Defendant's legitimate expectations and that similarly situated coworkers were treated more favorably. *See* [18-2] at 5.

### a.     Legitimate Employment Expectations

Ordinarily, for a plaintiff to successfully state a prima facie case of discrimination, he must show that he met his employer's legitimate expectations. *Andrews*, 743 F.3d at 234. But the Seventh Circuit has held that this "flexible" inquiry "may be unnecessary" where "the issue is whether the plaintiff was singled out for discipline based on a prohibited factor," or where those judging the plaintiff's performance are those accused of discrimination. *Ismail v. Brennan*, 654 F. App'x 240, 243 (7th Cir. 2016) (internal quotation marks omitted). In other words, even if a plaintiff failed to meet "his employer's legitimate expectations, he can still establish a prima facie case" if his employer "applied its expectations against him in a discriminatory manner." *Dossiea v. Bd. of Educ. of City of Chi.*, No. 07-c-1124, 2008 WL 4133418, at *4 (N.D. Ill. Aug. 22, 2008) (citing *Peele*, 288 F.3d at 329). Thus, if "a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner,

the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a prima facie case, stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele*, 288 F.3d at 329.

Here, the record shows that Plaintiff did not meet Defendant's legitimate employment expectations; he failed to maintain his case files and failed to complete the required billing paperwork in a timely manner. *See* DSOF ¶¶ 30, 41–45. Defendant has produced ample evidence of Plaintiff's failure to conform to its documentation requirements despite repeated warnings, reminders, and escalating disciplinary actions over at least a three-year period. *See id.*; *see also Peele*, 288 F.3d at 328 (plaintiff's 18-month history of critical performance evaluations and formal warnings established her failure to meet her employer's expectations).

It is undisputed, however, that Plaintiff's coworkers also fell short of Defendant's expectations; the parties disagree only about the extent to which their noncompliance compared to Plaintiff's. *See, e.g.*, R. DSOF ¶ 32. Plaintiff alleges that his supervisors treated him more harshly because of his age, noting that he was the only employee who was terminated despite noncompliance issues among his younger coworkers. *See* [28-1] at 14; [18-8] at 4; R. DSOF ¶¶ 16, 39; [29] at 11–12. The issue before this Court, therefore, is "whether the plaintiff was singled out for discipline based on a prohibited factor," which favors omitting the *McDonnell Douglas* expectations prong. *Ismail*, 654 F. App'x at 243.

Additionally, two of the individuals responsible for Plaintiff's allegedly discriminatory termination also judged his performance: Courtney Clark,

Defendant's Director of Child and Family Counseling Services, and Meg Garey, Plaintiff's supervisor, evaluated Plaintiff's performance and participated in the decision to terminate him. *See* [18-7] at 21; DSOF ¶¶ 42, 48, 53, 56. This also favors omitting or minimizing the expectations prong. *See Ismail*, 654 F. App'x at 243; *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 612 n.3 (7th Cir. 2001) (expectations prong was unnecessary where the people judging the plaintiff's performance were the same she accused of discrimination), *overruled on other grounds by Ortiz*, 834 F.3d at 765.

As a result, the question of whether Plaintiff met Defendant's legitimate expectations "merges" with the question of whether similarly situated employees were treated differently. *Peele*, 288 F.3d at 329. Plaintiff may therefore establish his prima facie case if he provides sufficient evidence to permit the inference that although other employees also failed to meet Defendant's expectations, Defendant singled out Plaintiff with disparately applied disciplinary measures. *See id.*; *see also Dossiea*, 2008 WL 4133418, at *4.

### b. Similarly Situated Employees

To survive summary judgment, a plaintiff must demonstrate that "at least one similarly situated employee, outside of their protected class, was treated more favorably than they were." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). A similarly situated employee must be "directly comparable" to the plaintiff "in all material respects." *Id.* (internal quotation marks omitted). The similarly-situated determination flows from a "common-sense" analysis of relevant

factors, including whether the other employee "held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Id.* (internal quotation marks omitted). An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 662 (7th Cir. 2016).[2] Whether a comparator is similarly situated is "usually a question for the fact-finder," but summary judgment is appropriate if "no reasonable fact-finder could find" that the plaintiff has met his "burden on the issue." *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012).

In cases where a plaintiff alleges that his employer disciplined him more harshly than a similarly situated employee based upon a prohibited factor, "a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Dosseia*, 2008 WL 4133418, at *5 (internal quotation marks and alterations omitted). In such cases, the question of whether similarly situated employees were treated more favorably "overlap[s] with, and cannot be separated from, the question of whether the defendant's explanation for firing" Plaintiff is pretextual. *Simpson*, 827 F.3d at 661. If a jury could reasonably find that Defendant "applied its rules disparately," then Defendant cannot "plausibly assert that its application of those same rules was a nonpretextual reason" for firing Plaintiff. *Id.*

---

[2] This Court cites some cases, like *Simpson*, that arise in the race discrimination context; those cases guide this Court's assessment of the *McDonnell Douglas* framework, which applies equally to "claims of both age and race discrimination." *Simpson*, 827 F.3d at 661.

Here, Defendant concedes that Plaintiff's coworkers were similarly situated in terms of their roles, qualifications, and obligations. [18-2] at 9. Additionally, two of Plaintiff's coworkers were under 40 at the time of his firing, and thus outside the protected class, *see* DSOF ¶¶ 22, 23, while the other two were over 40, but still substantially younger than Plaintiff and thus valid comparators under the ADEA, *see* DSOF ¶¶ 20, 21; *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 n.4 (7th Cir. 2008). This Court's inquiry therefore focuses on the performance and conduct of Plaintiff's coworkers and whether Defendant applied its disciplinary measures disparately. *See Simpson*, 827 F.3d at 662.

Plaintiff's coworkers also struggled to meet Defendant's documentation requirements; thus, this Court must determine whether Plaintiff's performance fell appreciably below that of his colleagues. *See, e.g.*, R. DSOF ¶ 32–33. Defendant contends that once paperwork issues "were addressed with plaintiff's co-workers, less effort was required to keep the co-workers current" compared to Plaintiff. DSOF ¶ 45. Plaintiff argues that his coworkers continued to fall behind on documentation; that the Bridges Program required more hours working with clients, leaving Plaintiff less time for paperwork than his colleagues on the Encuentro program; that he was assigned more difficult cases, which also required more and longer hours outside the office; and that Garey, his supervisor, singled him out by yelling at him and making disrespectful comments about his age. *See* R. DSOF ¶ 45; PSAF ¶ 34; [28-3] at 7, 15, 18; [28-8] at 5, 7.

Plaintiff's potential comparators are his four coworkers in the Encuentro/Bridges programs: Chaidez, Aguilar, Quezada, and Luque. Defendant produced significant evidence showing that Chaidez, Aguilar, and Luque did not experience performance problems or miss paperwork deadlines to nearly the extent that Plaintiff did. *See* [18-10] at 31–32, 34 (Chaidez's performance evaluations); DSOF ¶ 30 (all employees except Plaintiff and Quezada became current with paperwork in June 2014); [18-10] at 36, 38 (Luque's evaluations); [18-10] at 26, 28 (Aguilar's evaluations). Quezada's performance history more closely resembles Plaintiff's, *see* DSOF ¶ 30; [18-10] at 22, 24, although Garey attested that Quezada was not as behind on her work as Plaintiff and made progress once placed on a PIP, *see* [18-12] at 5.

In light of the above, the performance histories of Chaidez, Aguilar, and Luque ostensibly appear "sufficiently distinct" from Plaintiff's conduct to render these "proposed comparators not similarly situated." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 705 (7th Cir. 2013). Quezada, however, appears to be a more valid comparator, given her similar performance evaluations and the requirement at summary judgment that this Court credit Plaintiff's statement that Quezada was also "very behind" in her paperwork, [28-8] at 5, rather than Garey's declaration that she "made progress," [18-12] at 5. This Court is also mindful that comparators need not be "nearly identical," but merely "comparable" in their infractions. *Coleman*, 667 F.3d at 852.

In the present inquiry, however, this Court cannot rule out *any* of Plaintiff's coworkers as potential comparators. Although the performance histories of at least three of Plaintiff's colleagues outshine his own to some degree, this Court must consider whether their superior evaluations reflect disparate treatment by Defendant, and support an inference that Defendant's proffered reason for Plaintiff's termination was pretextual. *See Simpson*, 827 F.3d at 661. Plaintiff offers evidence in the form of his deposition and a sworn statement, corroborated in part by testimony from his coworkers, indicating that Plaintiff was subjected to more demanding standards than his coworkers, and then disciplined more harshly for failing to meet them: Plaintiff was the first employee in the Encuentro/Bridges program to be placed on a PIP, and the only one that Defendant fired for performance reasons. *See* DSOF ¶¶ 21, 23, 32, 50, 55, 57. Evidence that an employer did not enforce its rules "evenhandedly" can demonstrate both favorable treatment and pretext. *Coleman*, 667 F.3d at 853; *see also Simpson*, 827 F.3d at 661.

It is true that, with the exception of a few corroborating lines in his colleagues' testimony, Plaintiff's evidence of disparate treatment derives almost entirely from his own attestation. But "[s]elf-serving deposition testimony *may* satisfy a party's evidentiary burden on summary judgment" if it is "based on personal knowledge" and "grounded in observation as opposed to mere speculation." *See Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (internal quotation marks omitted). Plaintiff's deposition just crosses that line. His proffered evidence of his

differing case load and more demanding hours rests in part upon comparisons with his coworkers' cases and hours, without describing how Plaintiff came to know these details of his coworkers' caseloads. But Plaintiff describes weekly staff meetings at which the program supervisor and staff members discussed their cases, [28-3] at 8, so this Court infers that these comparisons arise from personal knowledge. Construing the record in the light most favorable to Plaintiff, *CTL ex rel. Trebatoski*, 743 F.3d at 528, Plaintiff has created a genuine issue of material fact as to whether he was treated more harshly than his younger coworkers.

At this stage of the proceedings, Plaintiff's case rests on several circumstances that, in combination, suggest that he was treated more harshly than his colleagues. First, Plaintiff claims that his program (Bridges) and his cases in particular demanded more out-of-office hours, which therefore could not be spent on paperwork. [28-8] at 5–6; [28-3] at 7–8. Chaidez's deposition confirms that Bridges cases were "more intensive" than Encuentro cases, [18-5] at 6, 8, and both Luque and Chaidez noted that Plaintiff spent more time working with clients outside the office, on more complicated cases, [18-5] at 19, [18-11] at 8–10. Second, Plaintiff indicates—albeit without much detail—that some of his coworkers were given more in-office hours to catch up on their paperwork. [28-8] at 5, 7. Third, Plaintiff points out that even though he had less time to spend on paperwork—which he claims Garey knew—his coworkers continued to fall behind, and yet were not disciplined as harshly, if at all. *See* [28-3] at 8, 9–10. Although Chaidez, Luque, and Aguilar had more positive performance evaluations over the two-year period before Plaintiff's

termination, the record confirms that when Plaintiff was first placed on a PIP in July 2014 and when he was fired in October 2014, his coworkers were also behind on documentation, and yet were not disciplined at that time. *See* DSOF ¶¶ 30, 32, 38; [18-5] at 20; [28-8] at 5. Quezada and Luque were placed on PIPs a few months after Plaintiff's termination, but neither was terminated. *See* DSOF ¶¶ 21, 23, 32, 38; [28-5] at 5.

Taking the relevant inferences in Plaintiff's favor, Defendant assigned Plaintiff more work, and more difficult work, and then applied its disciplinary practices more harshly to him, even though his younger coworkers committed similar infractions. This raises a genuine issue of material fact as to whether Plaintiff's coworkers were treated more favorably, and whether Defendant's stated reason for discharging Plaintiff was pretextual. *See Curry v. Menard, Inc.*, 270 F.3d 473, 479 (7th Cir. 2001) (inconsistent disciplinary measures taken against the plaintiff compared with her coworkers created genuine issue of material fact as to whether comparators were treated more favorably and whether the reason for plaintiff's discharge was pretextual).

Finally, Clark, the Director of Child and Family Counseling Services and Garey's superior, *see* DSOF ¶ 11, admitted that the performance information in Defendant's records came from Garey, or at least after Garey became the Encuentro/Bridges supervisor in June 2014, *see* [18-7] at 21; DSOF ¶ 11; [18-12] at 2. Clark stated in her deposition that she would only know that an employee was "falling behind" when "the supervisor" brought it to her attention. [18-7] at 21. The

decision to terminate Plaintiff likewise started with information originating from Garey. *Id*. at 22.

This is significant in light of Plaintiff's accusation that Garey made disparaging remarks about him, but not other employees, including several remarks about his age. *See* PSAF ¶ 34; [28-3] at 15, 16, 18; [28] ¶ 5. Plaintiff claims that Garey yelled at him, but not his coworkers, in weekly group meetings, and on one occasion told him "I'm going to make sure that you leave and that you don't work here anymore." [18-3] at 16. Plaintiff also claims that on at least three occasions Garey made comments to the effect that Plaintiff's job was not suitable for someone of his age, and he "had to find a job that was appropriate" for him. *Id*. at 18. Although insufficient to establish a hostile working environment, as discussed below, these comments—taken in context—can create an inference of bias on Garey's part, which provides evidence of discrimination given that Garey was the relevant decision-maker in disciplining and ultimately terminating Plaintiff. *See Huff v. UARCO, Inc.*, 122 F.3d 374, 384–85 (7th Cir. 1997); *see also Bowman v. Am. Drug Stores*, No. 00-c-7452, 2001 WL 1029388, at *2 (N.D. Ill. Sept. 6, 2001) (supervisor's age-related comments about the plaintiff were admissible evidence of age bias, precluding summary judgment).

Overall, Plaintiff's account raises a genuine issue of fact as to whether he was singled out for discipline while saddled with more work, and more difficult work, than his colleagues. *See Simpson*, 827 F.3d at 661; *Dossiea*, 2008 WL 4133418, at *6. Although Defendant has some documentation that distinguishes Plaintiff's

coworkers' conduct in some respects, much of that documentation rests significantly on Garey's judgment, which is what Plaintiff calls into question. Absent copies of the Encuentro/Bridges' staff members' case files, much of the evidence boils down to Defendant's assertions that Plaintiff's noncompliance was "more severe," *see, e.g.*, DSOF ¶¶ 45, 57, and Plaintiff's assertion that it was not, *see, e.g.*, PSAF ¶¶ 18, 25. Summary judgment "cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, genuine issues of material fact remain as to Defendant's treatment and termination of Plaintiff.

Ordinarily, once a plaintiff establishes his prima facie case, the burden shifts to the employer to articulate "a legitimate, non-discriminatory reason for the employee's termination." *Peele*, 288 F.3d at 326. As noted above, however, the disputed elements of Plaintiff's prima facie case—whether he met Defendant's legitimate expectations and whether similarly situated employees were treated more favorably—"overlap with, and cannot be separated from, the question of whether" Defendant's explanation for firing him is pretextual. *See Simpson*, 827 F.3d at 661. If a factfinder could determine that an employer applied its rules disparately, then the defendant "would not be able to plausibly assert that its application of those same rules was a nonpretextual reason for firing" an employee. *Simpson*, 827 F.3d at 661. This Court concludes that a factfinder could determine that Defendant applied its disciplinary procedures disparately. Accordingly, at this stage of litigation, Defendant cannot assert that its application of these procedures was a nonpretextual reason for firing Plaintiff. This Court therefore does not

proceed to the third phase of the *McDonnell Douglas* analysis but denies summary judgment on Plaintiff's wrongful termination claim based upon the foregoing analysis.

### 2. *Ortiz* Analysis

Assessing the evidence "cumulatively" under *Ortiz, David*, 846 F.3d at 22, this Court comes to the same conclusion. As discussed, Plaintiff's evidence that he was held to a higher standard and disciplined more harshly than his younger coworkers, particularly when combined with the alleged age-related comments made by his supervisor, creates genuine issues of material fact about the reasons for Plaintiff's termination. Based upon the evidence discussed above, a reasonable factfinder could conclude that Plaintiff's age caused his discharge, which precludes summary judgment on Plaintiff's wrongful termination claim. *See Ortiz*, 834 F.3d at 765.

### B. Hostile Work Environment

The Seventh Circuit has assumed, without deciding, that plaintiffs may bring hostile work environment claims under the ADEA. *See Bennington*, 275 F.3d at 660. Because the ADEA shares "substantive similarities" with Title VII of the Civil Rights Act, district courts often "look to law interpreting similar claims under Title VII" when examining ADEA hostile environment claims. *See Gaston v. Bd. of Educ. of the City of Chi.*, No. 17-c-1024, 2017 WL 3234375, at *2 (N.D. Ill. July 31, 2017).

To succeed on a hostile work environment claim, a plaintiff must show that: (1) he was subject to unwelcome harassment; (2) the harassment happened because

of his age; (3) the harassment was severe or pervasive enough to alter the conditions of his work environment; and (4) there is a basis for holding the employer liable. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016). Plaintiffs must present evidence showing "a workplace permeated with discriminatory ridicule, intimidation, and insult." *Alexander*, 739 F.3d at 982 (internal quotation marks omitted). In weighing this evidence, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). A workplace must be "hellish" to be actionable. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (internal quotation marks omitted).

Here, Plaintiff's allegations fall far short of creating an actionable hostile work environment. Plaintiff alleges that Garey treated him disrespectfully through intimidating body language and by yelling at him when he did not complete his work quickly. [28] at 2. In his affidavit, Plaintiff alleges that on an unspecified number of occasions, Garey came to his office and asked him loudly from the doorway if he had completed his paperwork, which made Plaintiff feel ashamed. [27] at 12–13. Plaintiff stated at his deposition that Garey referred to his age on at least three occasions between August and October 2014, telling Plaintiff that "his job was very stressful and due to his age, he should find a job that was more appropriate for his age." [28] at 5; [28-1] at 18.

Even taking all inferences in Plaintiff's favor, the behavior he describes does not constitute a "hellish" work environment. *Whittaker*, 424 F.3d at 645. The conduct described does not depict a workplace "permeated with discriminatory ridicule, intimidation, and insult." *Alexander*, 739 F.3d at 982 (internal quotation marks omitted). Rather, Plaintiff points to a handful of instances when Garey made comments that he found offensive. In the Seventh Circuit, it is "well settled that relatively isolated instances of non-severe misconduct will not support a claim of a hostile environment." *Whittaker*, 424 F.3d at 646; *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (overturning a jury verdict on a hostile work environment claim where the plaintiff only presented evidence of a "handful" of offensive comments "spread over months").

Here, no reasonable factfinder could conclude that Garey's "handful of comments" was so severe or pervasive that it altered a condition of Plaintiff's employment. *See id.*; *see also Bennington*, 275 F.3d at 660 (rejecting an age-based hostile work environment claim and noting that rude or unfair behavior alone does not constitute "legally redressible discrimination"). This Court grants Defendant's motion for summary judgment on Plaintiff's hostile work environment claim.

## IV. Conclusion

This Court partially grants and partially denies Defendant's motion for summary judgment, [18]. This Court grants summary judgment to Defendant on Plaintiff's hostile work environment claim but denies summary judgment on Plaintiff's unlawful termination claim.

Dated: January 30, 2018

Entered:

John Robert Blakey
United States District Judge